# Exhibit A

 CT Corporation

**Service of Process Transmittal**
06/24/2021
CT Log Number 539788445

TO: Linda Fogel
Stryker Corporation
2825 AIRVIEW BLVD
PORTAGE, MI 49002-1802

RE: **Process Served in New York**

FOR: Howmedica Osteonics Corp.  (Domestic State: NJ)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | JAMES PINKOWSKI, Pltf. vs. HOWMEDICA OSTEONICS CORP., Dft. |
| **DOCUMENT(S) SERVED:** | -- |
| **COURT/AGENCY:** | None Specified<br>Case # EK12021000154 |
| **NATURE OF ACTION:** | Product Liability Litigation - Personal Injury |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, New York, NY |
| **DATE AND HOUR OF SERVICE:** | By Certified Mail on 06/24/2021 postmarked: "Illegible" |
| **JURISDICTION SERVED :** | New York |
| **APPEARANCE OR ANSWER DUE:** | None Specified |
| **ATTORNEY(S) / SENDER(S):** | None Specified |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 06/24/2021, Expected Purge Date: 06/29/2021 |
| | Image SOP |
| | Email Notification,  Linda Fogel  linda.fogel@stryker.com |
| | Email Notification,  Legal Operations Dept. .  legaloperations@stryker.com |
| | Email Notification,  Mary Lou Deyoung  marylou.deyoung@stryker.com |
| | Email Notification,  Rachel Malina  rachel.malina@stryker.com |
| **REGISTERED AGENT ADDRESS:** | C T Corporation System<br>28 Liberty Street<br>New York, NY 10005<br>866-331-2303<br>CentralTeam1@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.

DOS 470 (Rev. 10/09)

**DEPARTMENT OF STATE**
  One Commerce Plaza
  99 Washington Avenue
  Albany, NY 12231-0001

**Return Services Requested**

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

USPS CERTIFIED MAIL

9214 8969 0059 7933 6930 57

202106170063
C T CORPORATION SYSTEM
28 LIBERTY ST.
NEW YORK NY 10005

State of New York - Department of State
Division of Corporations

Party Served:                                    Plaintiff/Petitioner:
 HOWMEDICA OSTEONICS CORP.                         PINKOWSKI, JAMES


C T CORPORATION SYSTEM
28 LIBERTY ST.
NEW YORK,  NY 10005


Dear Sir/Madam:
Enclosed herewith is a legal document which was served upon the Secretary of
State on 05/27/2021 pursuant to SECTION 306 OF THE BUSINESS CORPORATION LAW.
 This copy is being transmitted pursuant to such statute to the address
provided for such purpose.


                                        Very truly yours,
                                    Division of Corporations

STATE OF NEW YORK   :

SUPREME COURT     :   COUNTY OF CHAUTAUQUA

JAMES PINKOWSKI
14 W. Green Street
Dunkirk, New York 14048

Plaintiff

vs.

**SUMMONS**
**Served with Complaint**
**Index #**

HOWMEDICA OSTEONICS CORP.
2825 Airview Boulevard
Kalamazoo, Michigan 49002

Defendant

To the above named Defendant:

    **YOU ARE HEREBY SUMMONED AND REQUIRED** to serve upon the Plaintiff's attorneys, at the address stated below, a written Answer to the attached Complaint.

    If this Summons is served upon you within the State of New York by personal service you must respond within **TWENTY (20)** days after service, not counting the day of service. If this Summons is not personally delivered to you within the State of New York you must respond within **THIRTY (30)** days after service is completed, as provided by law.

    If you do not respond to the attached Complaint within the applicable time limitation stated above, a Judgment will be entered against you, by default, for the relief demanded in the Complaint, without further notice to you.

This action is brought in the County of Chautauqua because of:

    [ X ]    Plaintiff's residence, or place of business;
    [    ]    Defendants' residence;
    [    ]    Designation made by Plaintiff.

- BROWN CHIARI LLP -

- Page 2 -

DATED:     Buffalo, New York
           February 1, 2021

_____
Theresa M. Walsh, Esq.
BROWN CHIARI LLP
**Attorneys for Plaintiff**
2470 Walden Avenue
Buffalo, New York 14225-4751
(716) 681-7190

STATE OF NEW YORK        :
SUPREME COURT            :      COUNTY OF CHAUTAUQUA

JAMES PINKOWSKI

                              Plaintiff

        vs.                                              **COMPLAINT**

                                                        Index #_____

HOWMEDICA OSTEONICS CORP.

                              Defendant

---

PLAINTIFF, JAMES PINKOWSKI, by his attorneys, BROWN CHIARI LLP, for his

Complaint in the above-entitled action alleges:

1. Plaintiff, JAMES PINKOWSKI, at all times herein mentioned, has been a resident of
the State of New York.

2. At all relevant times herein mentioned, Defendant HOWMEDICA OSTEONICS
CORP. conducted regular and sustained business in New York by selling and distributing its
products in New York.

3. Defendant HOWMEDICA OSTEONICS CORP. at all times herein mentioned,
engaged in the developing, inspecting, testing, assembling, designing, licensing, labeling,
manufacturing, distributing, packaging, supplying, marketing, and/or selling, either directly or
indirectly through third parties or related entities, hip replacement components including the LFIT
V40 Femoral Head and Accolade TMZF Plus Hip Stem.

4. This action is for damages arising out of Defendant's design, research,
development, testing, assembling, manufacturing, packaging, labeling, preparing,

- BROWN CHIARI LLP -

distributing, marketing, advertising, promoting, supplying, and/or selling the defective product sold under the name "LFIT CoCr V40 Femoral Head" (hereinafter "LFIT V40", "Defective Device", or "Device") and compatible femoral stem components with V40 interface to be used in conjunction with the LFIT V40 Femoral Head (hereinafter "Defective Compatible Component(s)"), including the Accolade TMZF Plus Hip Stem.

5. Defendant developed, manufactured, promoted and sold the LFIT™ CoCr V40 Femoral Head for placement into women and men's hips as a replacement implanted device. Defendant's Device was placed into the stream of interstate commerce and was implanted in consumers, including Plaintiff JAMES PINKOWSKI.

6. Defendant also developed, manufactured, promoted and sold several femoral stems with V40 interface designed to be used in conjunction with the LFIT V40 Femoral Head for placement into women and men's hips as a replacement implanted device. The Defendant's Defective Compatible Components were placed into the stream of interstate commerce and were implanted in consumers, including Plaintiff JAMES PINKOWSKI.

7. An individual's natural hip joint connects the thigh (femur) bone of his leg to his pelvis. The hip joint is characterized as a ball and socket joint. The socket is the cup shaped portion of the acetabulum into which the femoral head (ball) at the top of the femur bone inserts and articulates. Both the femoral head and acetabular socket are covered with cartilage forming a natural surface upon which the parts may move freely.

FILED: CHAUTAUQUA COUNTY CLERK 02/01/2021 09:45 PM
INDEX NO. EK12021000154
NYSCEF DOC. NO. 1
RECEIVED NYSCEF: 02/01/2021

- Page 3 -

8. In some individuals, cartilage can be damaged due to either trauma, disease or aging (arthritis). When this occurs, a hip replacement may be indicated. A total hip replacement utilizes parts manufactured from metal alloys, plastic, or ceramic to replace a patient's damaged native anatomy. A total hip replacement typically consists of four separate components: (1) a femoral stem, (2) a femoral head, (3) an acetabular liner, and (4) an acetabular shell. The procedure requires removing the arthritic femoral head and replacing the patient's natural anatomy with a femoral stem upon which a femoral head is impacted. The acetabulum is then reamed to accommodate the acetabular shell into which, once fixed, the liner is then placed. Once all the parts are inserted, the ball articulates within the acetabular liner much like the patient's natural hip.

9. The Defective Device was intended to replace patient's damaged or diseased natural anatomy. The Defective Device was indicated for patients requiring total hip arthroplasty.

10. On April 11, 2001, the Defendant received clearance from the Food and Drug Administration (hereinafter referred to as the "FDA") to market the LFIT CoCr V40 Femoral Head in the United States pursuant to Section 510(k) of the Food, Drug and Cosmetic Act. A medical device cleared under Section 510(k) does not have to go through any clinical study to gain clearance by the FDA, meaning it does not have to be tested in a single human being before placed on the market.

- BROWN CHIARI LLP -

11. On August 22, 2006, the Defendant received clearance from the FDA to market the LFIT Anatomic CoCr V40 Femoral Head in the United States pursuant to Section 510(k) of the Food, Drug and Cosmetic Act.

12. The LFIT V40 is a femoral head indicated for individuals requiring total hip arthroplasty.

13. The LFIT V40 can be used interchangeably with all of the Defendant's femoral stems with a V40 style trunnion.

14. According to the Defendant's materials, the LFIT V40 and X3 Liners were developed to address clinical factors associated with dislocation, strength and wear.

15. The Defendant's promotional material touts that the LFIT (Low Friction Ion Treatment) manufacturing process embeds nitrogen ions under high energy into the cobalt/chromium surface of large femoral heads, for the purported purpose of improving surface wettability, allowing increased lubrication between components, and decreasing frictional forces against the liner. The LFIT V40 Heads were (and are) offered in a variety of diameters.

16. The V40 taper is unique to the Defendant's implant components and is not utilized by other orthopedic device manufacturers. "V40" simply refers to the angular mismatch between the trunnion on the femoral stem and the female taper in the bore of the chrome cobalt head. When the femoral head is impacted onto the stem's trunnion, the dissimilar angles of the trunnion and the head's female taper form a "press fit." This "taper

junction," otherwise known as a Morse Taper, relies on the dissimilar angles to obtain fixation. The Morse Taper (a cone-within-a-cone) is used to mate the LFIT V40 Head with the different stems. The bore (female portion) of the LFIT V40 Head is placed onto the tapered trunnion (male portion) of the stem and impacted by the surgeon using a Stem Head Impactor tool. The stresses created by the dissimilar V40 angles compress the wall of the bore thereby locking it onto the femoral stem trunnion.

17. At the connection between the V40 chrome cobalt head and the V40 femoral stem trunnion, poor design and material choices lead to micro-motion, fretting, corrosion and ultimately failure of the device due to the generation of metal wear debris. In the most extreme circumstances, corrosion fueled by motion and accompanied by massive metal loss can result in the femoral head falling off the femoral stem, a phenomenon described in the medical literature as catastrophic dissociation. To date, the Defendant's V40 tapers are the only commercially available stem/head combinations to have suffered these catastrophic failures.

18. The Defendant's V40 tapers are more prone to *in vivo* motion, fretting, corrosion and production of metallic debris than other commercially available femoral replacement systems.

19. The defective design of Defendant's V40 tapers allows the head to move on the stem which promotes corrosion and fretting.

- BROWN CHIARI ʟʟᴘ -

20. The Defendant manufactured several of its femoral stems using a proprietary metal alloy called "TMZF." TMZF is an acronym that stands for Titanium, Molybdnum, Zirconium, and Fe, the chemical symbol for iron, the main elements of the TMZF alloy. Unlike most titanium alloys used in orthopaedic implants, which are alpha + beta type ($\alpha+\beta$-type) alloys, TMZF is a beta type ($\beta$-type) alloy. Unlike $\alpha+\beta$-type alloys, which contain vanadium as the alloying element, $\beta$-type alloys (like TMZF) are vanadium-free and the principal alloying elements typically consist of niobium, molybdenum, tantalum, or iron.

21. The Defendant's proprietary TMZF titanium alloy causes a significant amount of toxic corrosion when it is implanted in contact with CoCr (cobalt/chrome), like the LFIT V40 Femoral Head.

22. At all times material hereto, the Defendant developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Accolade TMZF Plus Femoral Hip Stem ("Accolade TMZF Plus"), either directly or indirectly, to members of the public within the United States including the State of New York, including hospitals, surgeons, and the Plaintiff JAMES PINKOWSKI.

23. The indications for use of both LFIT V40 Heads and Accolade TMZF Plus Hip Stems include patients who require total hip arthroplasty.

24. On October 09, 2002, Defendants received FDA clearance pursuant to Section 510(k) to sell its Accolade TMZF Plus in the United States. The Accolade TMZF Plus is a

- BROWN CHIARI LLP -

- Page 7 -

tapered non-porous coated femoral stem manufactured from a TMZF substrate material with a coating consisting of Commercially Pure Titanium and Purefix hydroxyapatite.

25. The Accolade TMZF Plus is designed to be used with a number of bearing surface components comprised of a modular ball (artificial femoral head), including the LFIT V40 Femoral Heads.

26. A femoral head commonly paired with the Accolade TMZF Plus is the LFIT V40.

27. A Morse taper is used to mate the LFIT V40 Head with the Accolade TMZF Plus Hip Stem. The bore of the LFIT V40 Head is placed onto the tapered trunnion of the Accolade TMZF Plus Hip Stem and impacted by the surgeon using a Stem Head Impactor tool. The stresses created by compression of the wall of the bore by the trunnion results in locking of the head/stem taper interface.

28. A failure of the V40 taper interface allows micro-motion of these components and promotes fretting which then promotes corrosion.

29. The material combination of a titanium alloy stem, with a cobalt chromium femoral head (like the LFIT V40), has been observed to cause corrosion. The Defendant knew or should have known at the time it sold these implants to the Plaintiff that its proprietary TMZF titanium alloy would cause severe and unusual corrosion when put in contact with cobalt/chrome components. The Defendant also knew or should have known

- BROWN CHIARI LLP -

FILED: CHAUTAUQUA COUNTY CLERK 02/01/2021 09:45 PM INDEX NO. EK12021000154
NYSCEF DOC. NO. 1                                                    RECEIVED NYSCEF: 02/01/2021

- Page 8 -

that this severe and unusual corrosion would predispose the hip implant to premature failure, necessitating a complex, risky, and painful revision surgery.

30. The Defendant manufactures, markets, and sells ceramic femoral heads that are compatible with the Accolade TMZF Plus Hip Stem. Upon information and belief, an Accolade TMZF Plus Hip Stem paired with a ceramic femoral head will not experience fretting and corrosion.

31. Despite the known problems associated with pairing dissimilar metals and/or micro-motion at the junction between the metal stem and metal head, the Defendant represented and warranted in its marketing materials that its proprietary alloys will not fret or corrode.

32. The Defendant knew or should have known at the time it sold the implants to the Plaintiff that its proprietary TMZF alloy should not be mated to CoCr products.

33. Although all of the Defendant's V40 stems are subject to failure when mated with a V40 chrome cobalt head, TMZF stems are more prone to failure when used in combination with LFIT V40 Heads.

34. The corrosion and metallic debris produced as a result of the use of the Defective Device as noted above, can result in Adverse Local Tissue Reaction ("ALTR") and tissue necrosis (death), among other things.

35. On or about August 29, 2016, the Defendant issued a voluntary worldwide "Urgent Medical Device Recall Notification" involving certain lots of LFIT V40 Heads

- BROWN CHIARI LLP -

manufactured prior to 2011 citing a "higher than expected" incidence of taper lock failure. The Defendant identified several "Potential Hazards" Associated with taper lock failure, including:

- Dislocation of the femoral head from the hip stem

- Fractured hip stem trunnions

- Excessive metallic debris

- Excessive wear debris

36. The recall notice further stated that the problems caused by the LFIT V40 Head include "revision" surgery," "inflammatory response," "adverse local tissue reaction," "dislocation," and "periprosthetic fracture." However, despite these serious "hazards," the recall notice provided no information concerning the cause of the failures or steps surgeons should take to monitor patients.

37. In this notice, the Defendant acknowledged that it had received reports of device failure due to heavy metal contamination. The Urgent Medical Device Recall Notification specifically referred to failures at the taper lock junction.

38. Nevertheless, the recall notification minimized the gravity and magnitude of the problem by noting that the reason for the voluntary recall was that the Defendant "has receive higher than expected complaints of taper lock failure for specific lots of the following certain sizes of the V40 LFIT Anatomic Cobalt Chrome femoral heads manufactured prior to 2011," thus conveying the message to surgeons that there was no

- BROWN CHIARI LLP -

FILED: CHAUTAUQUA COUNTY CLERK 02/01/2021 09:45 PM    INDEX NO. EK12021000154
NYSCEF DOC. NO. 1                                              RECEIVED NYSCEF: 02/01/2021

- Page 10 -

concern for other sizes beyond those specifically recalled– certain 36, 40 and 44 mm head diameters with certain specific offsets.

39. Moreover, the recall notice failed to advise surgeons that they should notify their patients of the recall or that the surgeons should pursue any specific follow up of their at-risk patients. Instead, the Defendant stated "implanted patients with LFIT Anatomic CoCr V40 femoral heads as described above should continue to be followed for the normal protocol established by his/her surgeon." The statement provided no guidance whatsoever to the surgeons since many of these failures occurred a number of years after the implantation and most surgeons don't require follow-up of a patient beyond the first year or two following implant. The Defendant knew that by providing ambiguous, and misleading "recommendation" that patients would not be notified of the recall, would not return to their surgeons and would not receive any testing to diagnose problems that if promptly detected could mitigate ongoing tissue damage or prevent catastrophic failure like disassociation of the femoral head from the stem.

40. In July of 2014 the American Association of Hip and Knee Surgeons, the American Academy of Orthopedic Surgeons and The Hip Society issued a Consensus Statement on Risk Stratification Algorithm for Management of Patients with Dual Modular Taper Total Hip Arthroplasty. While the statement was geared to dual modularity devices, many of its recommendations were equally applicable to single modularity at the neck head junction such as the Devices in issue here. For example, it recommended magnetic resonance imaging (MRI) in detection of local adverse soft tissue reaction as "an important diagnostic tool in evaluating the presence of adverse tissue reactions to the modular taper

- BROWN CHIARI LLP -

fretting corrosion... Early application of MRI may be important tool that allows early detection of adverse soft tissue reactions due to modular taper fretting corrosion. This has been reported and THA patients with neck–stem modularity as well as head–neck modularity." Nevertheless, the Defendant, in its misleading recall notice, did not suggest to surgeons that they call their patients for a visit to perform an MRI and determine if there was adverse tissue reaction.

41. The consensus statement also recommended frequent follow ups including patients at high-risk receiving six-month intervals and at moderate risk annual follow-up due to the risks of insidious tissue damage. The conclusion of the consensus statement is "there should be a low threshold to perform a systematic evaluation of patients with dual taper stem total hip arthroplasty as early recognition diagnosis will facilitate the initiation of appropriate treatment prior to significant adverse biological reactions." Nevertheless, the Defendant, in its misleading recall notice, did not suggest to surgeons that they call their patients to return for a visit to perform a systematic evaluation of patients with the LFIT V40 Heads and instead sought to minimize the problem and distinguish it from that of the notoriously disastrous recalled dual modular Rejuvenate and ABG II stems.

42. A simple, inexpensive blood test can be used to determine whether a patient is experiencing the corrosive process that lead to the 2016 recall. Specifically, the presence of elevated levels of cobalt, chromium, or titanium in the blood is an important sign that

the prosthetic hip is corroding. Despite the availability of this test, the Defendant's recall

notice failed to instruct surgeons to contact patients with the Device to perform such tests.

43. The Defendant, through its sales representatives who typically are present in the

operating room for the implantation, have possession, custody or control over their sales

representative records, which frequently keep track of which device was used by which

surgeon in particular patients. The Defendant could have provided those records to

surgeons to assist them in identifying which of their patients were implanted with the LFIT

V40 cobalt chromium heads. However, since the Defendant's strategy to deal with this

health disaster was the uninformative and misleading recall notice, the Defendant failed to

facilitate any surgeons' efforts to inform patients of the recall, and the need for periodic

follow up to look for signs of failure of the head stem junction. Such follow up, could have

led to earlier diagnosis of Device failure and surgical intervention.

44. Accordingly, the Defendant failed to mitigate damages arising from its defective

products and left patients uninformed of the recall, resulting in ongoing destruction of

tissue, muscle and bone causing worsening and permanent impairment in many unknowing

patients.

45. Individuals implanted with the Defective Device, have suffered significant

consequences, including but not limited to the following: fretting, corrosion, release of

metal ions and/or metal wear debris followed by pain, disability, destruction of tissue, the

- Page 13 -

development of fluid collections and pseudotumor and the necessity of revision surgery (removal and replacement). Frequent findings during revision surgery have included the presence of turbid, milky fluid collection, large pseudotumor formation, discolored or friable soft tissue and bone, bone and soft tissue necrosis, and detachment or tearing of muscle.

46. On or about April 21, 2008, Plaintiff JAMES PINKOWSKI underwent a left hip implant surgery utilizing a LFIT V40 Femoral Head and Accolade TMZF Plus Hip Stem.

47. Defendant HOWMEDICA OSTEONICS CORP. developed, inspected, tested, assembled, designed, licensed, manufactured, distributed, packaged, supplied, marketed, advertised and/or sold, either directly or through third parties or related entities, the LFIT V40 Femoral Head and Accolade TMZF Plus Hip Stem implanted into Plaintiff JAMES PINKOWSKI.

48. Defendant HOWMEDICA OSTEONICS CORP. knew, or should have known, of the previously aforementioned defective nature of the LFIT V40 Femoral Head and Accolade TMZF Plus Hip Stem and that subsequently high surgical revision rates were being reported in patients who received but continued to develop, inspect, test, assembly, design, license, label, manufacture, distribute, package, supply, market, advertise, and/or sell, either directly or indirectly through third parties or related entities, the LFIT V40 Head and Accolade TMZF Plus Hip Stem including those implanted into Plaintiff JAMES PINKOWSKI and failed to warn of the Plaintiff or his physician of the defective nature of said products.

- BROWN CHIARI LLP -

49. Plaintiff JAMES PINKOWSKI experienced severe symptoms, including but not limited to, pain and suffering and loss of mobility, after being implanted with the LFIT V40 Femoral Head and Accolade TMZF Plus hip stem and was required a revision surgery.

50. As a result of his injuries resulting from use of LFIT V40 Femoral Head and Accolade TMZF Plus Hip Stem, Plaintiff JAMES PINKOWSKI has sustained pain and suffering and loss of enjoyment of life, and will continue to suffer such losses into the future.

## AS AND FOR A FIRST CAUSE OF ACTION, PLAINTIFF ALLEGES:

51. Plaintiff repeats and realleges paragraphs 1 through 50 as though fully set forth herein.

52. Defendant HOWMEDICA OSTEONICS CORP. had a duty to exercise reasonable care in the developing; testing; assembling; designing; licensing; labeling; manufacturing; distributing; packaging; supplying; ordering; marketing; educating, training, and/or detailing to physicians and/or hospitals; advertising; and selling of the LFIT V40 Femoral Head and Accolade TMZF Plus Hip Stem implanted into Plaintiff JAMES PINKOWSKI including a duty to assure that the products did not pose a significantly increased risk of bodily harm and adverse events.

53. Defendant HOWMEDICA OSTEONICS CORP. failed to exercise ordinary care in the developing; inspecting; testing; assembling; designing; licensing; labeling; manufacturing; distributing; packaging; supplying; ordering; marketing; educating, training, and/or detailing to physicians and/or hospitals; advertising; and/or selling of the LFIT V40 Femoral Head and Accolade TMZF Plus Hip Stem implanted into Plaintiff JAMES PINKOWSKI.

- BROWN CHIARI LLP -

54. The resulting injuries to the Plaintiff JAMES PINKOWSKI were caused solely by the negligence of the Defendant HOWMEDICA OSTEONICS CORP. in failing to use reasonable care in developing; inspecting; testing; assembling; designing; licensing; labeling; manufacturing; distributing; packaging; ordering; marketing; educating, training, and/or detailing to physicians and/or hospitals; advertising; and/or selling the LFIT V40 Femoral Head and Accolade TMZF Plus Hip Stem implanted into Plaintiff JAMES PINKOWSKI.

55. As a result of the foregoing, the Plaintiff JAMES PINKOWSKI has sustained severe, debilitating and permanent injuries and economic damages in an amount in excess of the jurisdictional limits of all lower courts which would otherwise have jurisdiction.

## AS AND FOR A SECOND CAUSE OF ACTION, PLAINTIFF ALLEGES:

56. Plaintiff repeats and realleges paragraphs 1 through 55 as though fully set forth herein.

57. The Defendant HOWMEDICA OSTEONICS CORP. expressly warranted that the aforementioned the LFIT V40 Femoral Head and Accolade TMZF Plus Hip Stem were safe, effective and reasonably fit for use by Plaintiff JAMES PINKOWSKI.

58. The LFIT V40 Femoral Head and Accolade TMZF Plus Hip Stem did not conform to these express representations because the products were defective and caused serious physical injury to consumers.

59. At all relevant times herein, Plaintiff JAMES PINKOWSKI was using the products for the purpose and in the manner intended, and that by the use of reasonable care could not have both discovered these breaches and realized their danger.

- BROWN CHIARI LLP -

60. As a result of Defendant's breach of express warranties, Plaintiff JAMES PINKOWSKI sustained severe, debilitating and permanent injuries and economic damages in an amount in excess of the jurisdictional limits of all lower courts which would otherwise have jurisdiction.

## AS AND FOR A THIRD CAUSE OF ACTION, PLAINTIFF ALLEGES:

61. Plaintiff repeats and realleges paragraphs 1 through 60 as though fully set forth herein.

62. At the time Defendant HOWMEDICA OSTEONICS CORP. developed; inspected; tested; assembled; designed; licensed; labeled; manufactured; distributed; packaged; supplied; ordered; marketed; educated; trained; educated, trained and/or detailed physicians and/or hospitals; advertised; and/or sold the LFIT V40 Femoral Head and Accolade TMZF Plus Hip Stem implanted into Plaintiff JAMES PINKOWSKI, the Defendant knew the use for which they were intended and impliedly warranted the product to be of merchantable quality and safe and fit for its intended use.

63. Contrary to the Defendant's implied warranties, the LFIT V40 Femoral Head and Accolade TMZF Plus Hip Stem was not of merchantable quality and was not safe for its intended use because the product was defective and unreasonably dangerous as described herein.

64. As a result of Defendant's breach of implied warranties, Plaintiff JAMES PINKOWSKI sustained severe, debilitating and permanent injuries and economic damages in an amount in excess of the jurisdictional limits of all lower courts which would otherwise have jurisdiction.

- BROWN CHIARI LLP -

FILED: CHAUTAUQUA COUNTY CLERK 02/01/2021 09:43 PM    INDEX NO. EK12021000154
NYSCEF DOC. NO. 1                                      RECEIVED NYSCEF: 02/01/2021

- Page 17 -

## AS AND FOR A FOURTH CAUSE OF ACTION,
## PLAINTIFF ALLEGES:

65. Plaintiff repeats and realleges paragraphs 1 through 64 as though fully set forth herein.

66. The LFIT V40 Femoral Head and Accolade TMZF Plus Hip Stem implanted into Plaintiff JAMES PINKOWSKI were designed, produced, manufactured, distributed, supplied and/or sold by the Defendants HOWMEDICA OSTEONICS CORP. in a defective condition which included, but is not limited to, manufacturing defects, design defects and/or inadequate warnings or instructions.

67. The Defendants HOWMEDICA OSTEONICS CORP. designed, produced, manufactured, distributed, supplied and/or sold the aforesaid products in a defective condition and are therefore liable to Plaintiff JAMES PINKOWSKI for the injuries he sustained in strict products liability.

68. Plaintiff JAMES PINKOWSKI used the aforesaid products for their intended and foreseeable purpose.

69. As a result of the above, Plaintiff JAMES PINKOWSKI sustained severe, debilitating and permanent injuries and economic damages in an amount in excess of the jurisdictional limits of all lower courts which would otherwise have jurisdiction.

70. That one or more exceptions to the limited liability provisions of CPLR Article 16 apply herein.

- BROWN CHIARI LLP -

Case 1:21-cv-00793-WMS   Document 1-1   Filed 07/12/21   Page 24 of 26   INDEX NO. EK12021000154

     **WHEREFORE**, Plaintiff JAMES PINKOWSKI does hereby demand judgment against Defendant HOWMEDICA OSTEONICS CORP., jointly and severally, for a sum that exceeds the jurisdictional limitations of all lower courts that would otherwise have jurisdiction in this action, together with the costs and disbursements of this action and punitive damages in an amount to be determined by a jury.

DATE: Buffalo, New York
     February 1, 2021

                               Theresa M. Walsh, Esq. for
                               BROWN CHIARI LLP
                               **Attorneys for Plaintiff**
                               2470 Walden Avenue
                               Buffalo, New York 14225-4751
                               (716) 681-7190

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF** CHAUTAUQUA
-------------------------------------------------------------------x
JAMES PINKOWSKI

                Plaintiff/Petitioner,

    - against -                    Index No.EK12021000154

HOWMEDICA OSTEONICS CORP.
                Defendant/Respondent.
-------------------------------------------------------------------x

## NOTICE OF ELECTRONIC FILING
### (Mandatory Case)
(Uniform Rule § 202.5-bb)

**You have received this Notice because**:

    1) The Plaintiff/Petitioner, whose name is listed above, has filed this case using the New York State Courts E-filing system ("NYSCEF"), and

    2) You are a Defendant/Respondent (a party) in this case.

- **If you are represented by an attorney:**
  Give this Notice to your attorney.  (<u>Attorneys</u>: see "Information for Attorneys" pg. 2).

- **If you are not represented by an attorney:**
  **You will be served with all documents in paper and you must serve and file your documents in paper, unless you choose to participate in e-filing.**

  **If you choose to participate in e-filing, you <u>must</u> have access to a computer and a scanner or other device to convert documents into electronic format, a connection to the internet, and an e-mail address to receive service of documents.**

  The **benefits of participating in e-filing** include:

  - serving and filing your documents electronically

  - free access to view and print your e-filed documents

  - limiting your number of trips to the courthouse

  - paying any court fees on-line (credit card needed)

**To register for e-filing or for more information about how e-filing works:**

- visit: <u>www.nycourts.gov/efile-unrepresented</u> or
- contact the Clerk's Office or Help Center at the court where the case was filed. Court contact information can be found at <u>www.nycourts.gov</u>

To find legal information to help you represent yourself visit www.nycourthelp.gov

**Information for Attorneys**
**(E-filing is Mandatory for Attorneys)**

An attorney representing a party who is served with this notice must either:

1) immediately record his or her representation within the e-filed matter on the NYSCEF site www.nycourts.gov/efile ; or

2) file the Notice of Opt-Out form with the clerk of the court where this action is pending and serve on all parties. Exemptions from mandatory e-filing are limited to attorneys who certify in good faith that they lack the computer hardware and/or scanner and/or internet connection or that they lack (along with all employees subject to their direction) the knowledge to operate such equipment. [Section 202.5-bb(e)]

For additional information about electronic filing and to create a NYSCEF account, visit the NYSCEF website at www.nycourts.gov/efile or contact the NYSCEF Resource Center (phone: 646-386-3033; e-mail: efile@nycourts.gov).

Dated: May 26, 2021

Theresa M. Walsh, Esq.                    2470 Walden Avenue
        Name                                      Address

Brown Chiari LLP                          Buffalo, New York 14225
     Firm Name

                                          (716) 681-7190
                                              Phone

                                          twalsh@brownchiari.com
                                              E-Mail

To:

                                                          6/6/18

Index #                   Page 2 of 2                EFM-1